**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____


Nos. 20-2551 & 20-2661
_____


CHARLENE DZIELAK; SHELLEY BAKER; FRANCIS
ANGELONE; BRIAN MAXWELL; JEFFERY REID; KARI
PARSONS; CHARLES BEYER; JONATHAN COHEN;
JENNIFER SCHRAMM; ASPASIA CHRISTY,
on behalf of themselves and all others similarly situated,

v.

WHIRLPOOL CORPORATION;
SEARS HOLDINGS CORPORATION; HOME DEPOT
USA INC; FRY'S ELECTRONICS INC.; APPLIANCE
RECYCLING CENTERS OF AMERICA INC; LOWE'S
HOME CENTERS, LLC

Charlene Dzielak; Shelley Baker; Francis Angelone; Brian
Maxwell; Jeffery Reid; Kari Parsons; Charles Beyer;
Jonathan Cohen; Jennifer Schramm; Aspasia Christy,

Appellants in 20-2551


Whirlpool Corporation,
Appellant in 20-2661

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2:12-cv-00089)
District Judge: Hon. Kevin C. McNulty
_____

Argued: May 24, 2022

Before: KRAUSE, BIBAS, and PHIPPS, *Circuit Judges*.

(Filed: September 29, 2023)

_____

Neal J. Deckant                    **[ARGUED]**
BURSOR & FISHER
1990 N. California Boulevard, Suite 940
Walnut Creek, CA 94596

Scott A. Bursor
BURSOR & FISHER
701 Brickell Avenue, Suite 1420
Miami, FL 10019

    *Counsel for Appellants/Cross-Appellees*

Antonio Vozzolo
VOZZOLO LLC
345 Route 17 S.
Upper Saddle River, NJ 07548

    *Counsel for Appellants*

Louis Chaiten
James R. Saywell        **[ARGUED]**
JONES DAY
901 Lakeside Avenue
North Point
Cleveland, OH 44114

*Counsel for Appellee/Cross-Appellant Whirlpool Corporation*

David R. Kott
MCCARTER & ENGLISH
100 Mulberry Street
Four Gateway Center, 14th Floor
Newark, NJ 07102

Allison R. McLaughlin
Eric L. Robertson
WHEELER TRIGG O'DONNELL LLP
370 17th Street, Suite 4500
Denver, CO 80202

*Counsel for Appellee/Cross-Appellant Whirlpool Corporation and Appellees Sears Holdings Corporation, Fry's Electronics, Inc., and Lowe's Home Centers, LLC*

Galen D. Bellamy
Michael T. Williams
WHEELER TRIGG O'DONNELL LLP
370 17th Street, Suite 4500
Denver, CO 80202

*Counsel for Appellee/Cross-Appellant Whirlpool Corporation, Appellees Sears Holdings Corporation and Fry's Electronics, Inc., and Cross-Appellant Lowe's Home Centers, LLC*

Sidney S. Haskins, II        **[ARGUED]**
KING & SPALDING
1180 Peachtree Street N.E., Suite 1600
Atlanta, GA 30309

Lisa B. Geraghty
STARR GERN DAVISON & RUBIN
105 Eisenhower Parkway, Suite 401
Roseland, NJ 07068

*Counsel for Appellee Home Depot USA, Inc.*

_____

OPINION OF THE COURT

_____

PHIPPS, *Circuit Judge*.

From its inception in 1992, the Energy Star Program has set energy efficiency standards for various categories of products and permitted approved products to bear the Energy Star logo. Three models of top-loading clothes washers were approved to display that logo, and they did so from their entry into the market in April 2009 until their discontinuation in December 2010. But under one method of measurement, those machines did not meet the Program's energy- and water-efficiency standards. Although those clothes washers did satisfy the Program's standards under another measurement technique, which the Program previously endorsed, Program guidance from July 2010 disapproved of that method. Still, those models were permitted to display the Energy Star logo until February 2011.

In January 2012, consumers in several states who had purchased those models commenced this suit as a putative class action in the District Court against the manufacturer of the clothes washers and retailers that sold those machines. Plaintiffs brought several claims, including counts for breach of express warranty and for violations of state consumer-protection statutes. All of the claims related to the allegedly wrongful display of the Energy Star logo on the three models that did not meet Energy Star standards under the July 2010 Program guidance. The District Court certified a class action against the manufacturer, but it declined to certify a class for the claims against the retailers. At summary judgment, the District Court rejected all remaining claims by the class and by the named plaintiffs, including the express-warranty and consumer-protection claims.

Plaintiffs appealed to dispute two components of the District Court's summary-judgment ruling. They now argue, first, that the District Court erred in denying their claims for breach of express warranty. And second, they challenge the District Court's judgment rejecting their statutory consumer-protection claims.

The manufacturer cross-appealed to contest class certification, but it conditioned that cross-appeal on plaintiffs' successful appeal of their class claims.

On *de novo* review, there is no genuine dispute of material fact, and the manufacturer and the retailers are entitled to judgment as a matter of law on the appealed issues. That conclusion obviates the need to address the manufacturer's cross-appeal, so we will affirm the judgment of the District Court.

## I. BACKGROUND

### A. The Origins of the Energy Star Program and Its Applicability to Clothes Washers

#### 1. Energy Star Standards and Testing

The United States Environmental Protection Agency developed the Energy Star Program in response to the 1990 Amendments to the Clean Air Act. That legislation provided further direction for a previously authorized research and development program[1] by requiring the EPA to "conduct a basic engineering research and technology program to develop, evaluate, and demonstrate nonregulatory strategies and technologies for air pollution prevention." Pub. L. No. 101-549, tit. IX, sec. 901(c), § 103(g), 104 Stat. 2399, 2703 (Nov. 15, 1990) (codified at 42 U.S.C. § 7403(g)). As part of its response to that mandate, the EPA introduced the Energy Star Program in 1992 "as a voluntary labeling program designed to promote – and allow consumers to identify –

---

[1] In amending the Clean Air Act of 1963, Pub. L. No. 88-206, 77 Stat. 392 (Dec. 17, 1963), through the Air Quality Act of 1967, Congress directed the Secretary of the Department of Health, Education, and Welfare to "establish a national research and development program for the prevention and control of air pollution." Pub. L. No. 90-148, sec. 2, § 103(a), 81 Stat. 485, 486 (Nov. 21, 1967). And with the creation of the EPA in 1970, the Administrator of the EPA assumed responsibility for implementing that research and development program. *See* Reorganization Plan No. 3 of 1970, § 2(a)(3), 84 Stat. 2086, 2087, 2089 (July 9, 1970); Reorganization Plan No. 3 of 1970, 35 Fed. Reg. 15,623, 15,624 (Oct. 6, 1970); *see also* 42 U.S.C. § 1857b(a) (1970) ("The *Administrator* shall establish a national research and development program for the prevention and control of air pollution . . ." (emphasis added) (current version codified at 42 U.S.C. § 7403(a)).

energy-efficient computers and monitors." Gov't Accountability Off., *Energy Star Program* 1, 3 (2010).[2]

The Energy Star Program expanded over time to cover additional categories of products. In 1996, the EPA entered a Memorandum of Cooperation with the United States Department of Energy ('DOE') for overseeing the Energy Star Program with respect to eight product categories, including clothes washers.[3] With the benefit of its experience in developing methods for measuring the energy efficiency of clothes washers for another program,[4] DOE in 1997 announced an updated testing method, referred to as the 'J1 Test Procedure,' for measuring the two standards the Energy Star

[2] *See also* 74 Fed. Reg. 25,732, 25,733 (May 29, 2009) ("EPA introduced ENERGY STAR in 1992 to label energy efficient computers."); S. Hrg. 110-1095, *The Implications of the Supreme Court's Decision Regarding EPA's Authorities with Respect to Greenhouse Gases Under the Clean Air Act: Hearing Before the S. Comm. on Env't & Pub. Works*, 110th Cong. 24 (Apr. 24, 2007) (statement of Stephen L. Johnson, Administrator, Env't Prot. Agency).

[3] *See* Dep't of Energy & Env't Prot. Agency, *Memorandum of Cooperation on Energy Efficient, Environmentally Beneficial Buildings* (1996) (included as exhibit to *Global Climate Change: Joint Hearing Before the Subcomm. on Energy Rsch., Dev., Prod. and Regul. of the S. Comm. on Energy and Nat. Res. and Subcomm. on Nat'l Econ. Growth, Nat. Res., and Regul. Affs. of the H. Comm. on Gov't Reform*, 106th Cong. 64–66 (1999)); *see also* S. Hrg. 110-1095, *supra*, at 24; U.S. Dep't of Energy, Off. of Inspector Gen., *Audit Report: The Department's Management of the ENERGY STAR Program* 1 (Oct. 14, 2009).

[4] *See* Energy Conservation Program for Consumer Products: Clothes Washer Energy Conservation Standards, 66 Fed. Reg. 3314, 3316–17 (Jan. 12, 2001) ("Federal test procedures for clothes washers were first established in 1977.").

Program used to assess the energy- and water-efficiency of clothes washers: the Modified Energy Factor and the Water Factor.[5] The J1 Test Procedure went into effect in 2004.[6]

With the Energy Star Program's expansion, it received formal recognition and greater definition in statute. The Energy Policy Act of 2005 preserved Energy Star's character as a voluntary labeling program for energy-efficient products:

> There is established within the Department of Energy and the Environmental Protection Agency a voluntary program to identify and promote energy-efficient products and buildings in order to reduce energy consumption, improve energy security, and reduce pollution through voluntary labeling of, or other forms of communication about, products and buildings that meet the highest energy conservation standards.

---

[5] *See* Energy Conservation Program for Consumer Products: Test Procedure for Clothes Washers and Reporting Requirements for Clothes Washers, Clothes Dryers, and Dishwashers, 62 Fed. Reg. 45,484, 45,508 (Aug. 27, 1997); *see also* 10 C.F.R. pt. 430, subpt. B, app. J1, §§ 4.2.3, 4.4 (2004) (defining "modified energy factor" and "water consumption factor").

[6] *See* 10 C.F.R. pt. 430, subpt. B, app. J1 (2004) ("The provisions of this appendix J1 shall apply to products manufactured beginning January 1, 2004."); Energy Conservation Program for Consumer Products: Test Procedure for Clothes Washers, 68 Fed. Reg. 62,198, 62,198 (Oct. 31, 2003) (announcing a direct final rule for amendments to the J1 Test Procedure to take effect on January 1, 2004, along with the new standards).

Pub. L. No. 109-58, sec. 131, § 324A(a), 119 Stat. 594, 620 (Aug. 8, 2005) (codified at 42 U.S.C. § 6294a(a)). The Act also identified the responsibilities that accompanied the Program's administration. Those duties, which were divided as agreed between the EPA and DOE, *see id.* § 6294a(b), included working to enhance public awareness of the Energy Star label, *see id.* § 6294a(c)(2), preserving the integrity of the label, *see id.* § 6294a(c)(3), and "promot[ing] Energy Star compliant technologies as the preferred technologies in the marketplace for . . . achieving energy efficiency [and] reducing pollution," *id.* § 6294a(c)(1).

Several provisions of the Energy Policy Act also accounted for anticipated innovation in energy-efficient technologies. Congress required the agencies to "regularly update Energy Star product criteria for product categories," *id.* § 6294a(c)(4), which required an explanation of the changes, *see id.* § 6294a(c)(6), the solicitation of comments from interested parties, *see id.* § 6294a(c)(5), as well as an agency response to those comments, *see id.* § 6294a(c)(6). And, unless specified otherwise by one of the agencies, 270 days' notice was required before a "new or a significant revision to a product category, specification, or criterion" could take effect. *Id.* § 6294a(c)(7).

The Energy Policy Act further directed DOE to issue new qualifying levels for clothes washers to take effect in 2009. *See id.* § 6294a(d). DOE did so, and between 2009 and 2011, the Energy Star Program required a Modified Energy Factor of at least 1.80 and a Water Factor of no more than 7.50. *See* Energy Conservation Program: Energy Conservation Standards for Residential Clothes Washers, 77 Fed. Reg. 32,308, 32,332–33 tbl. IV-5 (May 31, 2012) (describing historical Energy Star standards for top-loading clothes washers). By comparison, regulations at the time for standard clothes washers manufactured on or after January 1, 2007, required a Modified Energy Factor of at least 1.26 – considerably less than the Energy Star standard. *See* 10 C.F.R. § 430.32(g)(3) (2007).

9

And those regulations did not impose a Water Factor requirement on standard clothes washers.  *See id*.[7]

### 2. *The Energy Star Logo and Its Registration as a Certification Mark*

Product labeling is a key component of the Energy Star Program.  In the 1990s, the EPA had developed logos for manufacturers to identify their qualifying products as Energy Star certified.  *See* ENERGY, Reg. No. 2074946 (filed Apr. 12, 1995, registered July 1, 1997).  And in 2008, the EPA introduced the modern version of the Energy Star logo, which "consist[ed] of a cyan blue box with white writing and trim containing the word energy and a star below a curved line, with the words 'ENERGY STAR' in white in a small cyan box below the design."  ENERGY ENERGY STAR, Reg. No. 3569551, Application at 1 (June 11, 2008) (hereinafter '2008 Energy Star Application').  The logo had the following appearance:



*Id.*

The EPA applied to register that version of the Energy Star logo as a certification mark with the United States Patent and Trademark Office.[8]  In its application, the EPA included a

---

[7] Congress codified the Modified Energy Factor requirement in statute for clothes washers manufactured on or after January 1, 2011, and it added a Water Factor requirement of no more than 9.50.  *See* 42 U.S.C. § 6295(g)(9)(A) (2007).

[8] *See* 15 U.S.C. § 1127 (defining "certification mark," in relevant part, as "any word, name, symbol, or device, or any

certification statement that explained that the logo would be "used by authorized persons" to certify "that the items are more energy efficient than most items sold in the same [category]." 2008 Energy Star Application at 1. And the EPA included with its application "a copy of the standards that determine whether others may use the certification mark on their goods," as well as a statement that it "exercise[d] legitimate control over the use of the mark." 37 C.F.R. § 2.45(a) (2007). The EPA's submitted standards incorporated by reference the Energy Star Program's Modified Energy Factor and Water Factor benchmarks, which, at the time, were measured according to the J1 Test Procedure. 2008 Energy Star Application at 1.

On February 3, 2009, the Patent and Trademark Office granted the EPA's application and registered the Energy Star mark for a ten-year period. 2008 Energy Star Application at 1; *see generally* 15 U.S.C. § 1058(a) (providing a ten-year duration for registered marks).[9] As an owner of a certification mark, the EPA could allow others to use the mark to indicate characteristics of their products, such as their "origin, material, mode of manufacture, [or] quality." 15 U.S.C. § 1127; *see generally* Terry E. Holtzman, *Tips From the Trademark*

---

combination thereof – (1) used by a person other than its owner, or (2) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter, to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work . . . .").

[9] Registration of a certification mark entitles the registrant to the protections that registered trademarks receive. *See* 15 U.S.C. § 1054; *see also Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 159–60 (2d Cir. 2016); *Am. Bd. of Psychiatry & Neurology, Inc. v. Johnson-Powell*, 129 F.3d 1, 3 (1st Cir. 1997).

11

*Examining Operation: Certification Marks: An Overview*, 81 Trademark Rep. 180, 183 (1991) ("[A] license agreement is essential to the function of a certification mark."); *cf.* 15 U.S.C. § 1064(5)(D) (allowing a petition to cancel a certification mark if the registered owner "discriminately refuses to certify" qualifying goods or services).

To control the use of the Energy Star logo on clothes washers, DOE, as part of its cooperation with the EPA, entered partnership agreements with manufacturers seeking to enroll their machines in the Program.[10]  Under the model partnership agreement effective March 7, 2008, manufacturers had to conduct in-house testing of their own clothes washers according to the J1 Test Procedure for those machines to qualify for the Program.[11]  If, after self-testing, a machine satisfied the Program's Modified Energy Factor and Water Factor standards, DOE would authorize the manufacturer to display the Energy Star logo on that model and would share additional Program resources, such as marketing materials.[12]

Still, as the owner of the certification mark, the EPA had "an affirmative obligation . . . to monitor the activities of those who use the mark." *Midwest Plastic Fabricators, Inc. v. Underwriters Labs. Inc.*, 906 F.2d 1568, 1572 (Fed. Cir.

---

[10] *See ENERGY STAR Program Requirements and Criteria for Clothes Washers* 4 (Mar. 7, 2008); *see also* U.S. Dep't of Energy, Off. of Inspector Gen., *Audit Report: The Department's Management of the ENERGY STAR Program* 1 (Oct. 14, 2009) (explaining that under the 1996 Memorandum of Cooperation, DOE assumed responsibility for ensuring the proper use of the Energy Star logo on clothes washers).

[11] *See ENERGY STAR Program Requirements and Criteria for Clothes Washers* 4.

[12] Gov't Accountability Off., *Energy Star Program* 4 (2010).

1990).[13]  And despite allowing manufacturers to test their own machines, DOE retained discretion to "conduct tests on products that are referred to as ENERGY STAR qualified." *ENERGY STAR Program Requirements and Criteria for Clothes Washers* 1 (Mar. 7, 2008).

### 3. The Announced End of the Self-Testing Era and the Launch of a Pilot Program for Independent Verification

On September 30, 2009, the EPA and DOE decided to exert greater control over the use of the Energy Star logo.  Through a Memorandum of Understanding, which superseded the 1996 Memorandum of Cooperation, they announced that "[a]ll products will be required to be tested in an accredited laboratory and qualifying product information be submitted to the government before the product can be qualified as ENERGY STAR."  Dep't of Energy & Env't Prot. Agency, *Memorandum of Understanding on Improving the Energy Efficiency of Products and Buildings* 5 (Sept. 30, 2009).[14]

---

[13] *See also* U.S. Patent & Trademark Off., Trademark Manual of Examining Procedure § 1306.01(a), at 1300–37 (5th ed. Sept. 2007) ("The owner of a certification mark does not produce the goods or perform the services in connection with which the mark is used, and thus does not control their nature and quality. . . .  What the owner of the certification make does control is use of the mark by others on their goods or services. This control consists of taking steps to ensure that the mark is applied only to goods or services that contain the characteristics or meet the requirements that the certifier/owner has established or adopted for the certification."); *accord* U.S. Patent & Trademark Off., Trademark Manual of Examining Procedure § 1306.01(a), at 1300–39 (8th ed. Oct. 2011).

[14] *See also* Gov't Accountability Off., *ENERGY STAR: Providing Opportunities for Additional Review of EPA's Decisions Could Strengthen the Program* 7 (Sept. 2011)

That announcement of independent-laboratory testing did not provide a precise end date for the era of manufacturer self-testing. But in August 2010, DOE launched a pilot program "to verify the energy efficiency and water-use characteristics of selected ENERGY STAR products through laboratory testing." Dep't of Energy, *ENERGY STAR Appliance Verification Testing – Pilot Program Summary Report* 1 (Feb 3, 2012). Under that pilot program, DOE would select Energy Star-designated products for testing at independent laboratories. *See* Dep't of Energy, *FAQ for: ENERGY STAR Verification Testing Pilot Program* 1 (Dec. 2010).

The pilot program had two stages of verification testing. At Stage I, DOE would spot check a single unit of an Energy Star product at an independent laboratory. If the product's performance was within five percent of the relevant specification for the Energy Star Program, DOE would take no further action. *See id.* at 3. Products that failed at Stage I could proceed, at the manufacturer's election, to Stage II, which involved independent testing of between four and eight units to confirm whether they met Energy Star standards. *See id.* at 4. If a model also failed Stage II testing, DOE would refer the matter to the EPA for "appropriate action," which could include formal disqualification of the model from the Energy Star Program. App. 1000 ¶¶ 70–71 (Pls.' Statement of Additional Material Facts).

---

("Before the MOU, the program generally relied on a self-certification process for manufacturers to qualify products for the Energy Star label. Under the MOU, all products are now required to be tested in an accredited laboratory, and the results submitted to EPA before the products can be qualified for the Energy Star label.").

### B. Whirlpool's Enrollment of Maytag-Branded Clothes Washers in the Energy Star Program

Whirlpool, a Delaware corporation with a principal place of business in Benton Harbor, Michigan, is one of the world's largest manufacturers of home appliances. In 2006, it acquired Maytag Corporation, another appliance manufacturer. Afterwards, Whirlpool continued production of clothes washers and other products under the Maytag brand. In recognition of consumer willingness to pay premiums for Energy Star-labeled appliances, Whirlpool also sought to have some of its Maytag-branded clothes washers qualify for the Energy Star Program. But Whirlpool identified an ambiguity in the J1 Test Procedure as applied to some models of Maytag-branded top-loading clothes washers.

That procedure required measuring the capacity of a top-loading clothes washer by sealing its "clothes container" with a plastic sheet and filling it with "water to its uppermost edge." 10 C.F.R. pt. 430, subpt. B, app. J1, §§ 3.1.2, 3.1.4 (2004). Certain top-loading Maytag-branded clothes washers, however, had four different fill levels:



**Figure 1: Representation of Fill Levels for the Clothes Container Capacity Measurement for Vertical-Axis Clothes Washers**

15

App. 938 ¶ 165 (Pls.' Resp. to Defs.' Statement of Material Facts). And without specific guidance in the regulations, it was unclear which of those four levels corresponded to the uppermost edge of the clothes container. *See* Energy Conservation Program for Consumer Products: Test Procedure for Residential Clothes Washers, 75 Fed. Reg. 57,556, 57,574 (Sept. 21, 2010) (noting that the existing test procedures "could lead to multiple capacity measurements"). Yet the capacity of the clothes container was critical to meeting the qualifying levels for the Energy Star Program. A larger clothes-container capacity would more readily satisfy the Modified Energy Factor and the Water Factor thresholds needed for Energy Star compliance.

To enable more of its Maytag-branded clothes washers to qualify for the Energy Star Program, Whirlpool sought to use the top of the tub cover, known as 'Fill Level 4,' in self-testing those machines. So in March 2007, Whirlpool submitted a petition for waiver to DOE to allow its use of Fill Level 4 for measuring the capacity of its top-loading clothes washers. *See generally* 10 C.F.R. § 430.27 (2007). Two months later, a DOE representative, Bryan Berringer, responded in an email explaining that the petition was unnecessary because Whirlpool's proposed "measurement of the clothes container capacity to the upper edge of the tub cover" was already allowed under the J1 Test Procedure. Email from Bryan Berringer, U.S. Dep't of Energy to J.B. Hoyt, Whirlpool (May 14, 2007) (App. 851).

After receiving that email, Whirlpool used Fill Level 4 to test two models of its top-loading Maytag Centennial clothes washers: the C6-0 and the C6-1. At Fill Level 4, both models met the Modified Energy Factor and Water Factor thresholds for the Energy Star Program.[15] Based on those test results,

---

[15] Whirlpool's self-testing reported the C6-0 as having a Modified Energy Factor of 1.852 and a Water Factor of 7.108,

Whirlpool considered three of its Maytag Centennial models – the two tested along with the C7-0 model, which had the same energy profile as the C6-1 – to qualify for the Energy Star Program. Then, in April 2009, Whirlpool began shipping those three models to retailers with an Energy Star logo attached to each machine's control panel.

But in May 2010, DOE announced its intention to remove the ambiguity in the J1 Test Procedure's reference to the 'uppermost edge of the clothes container.' For the uppermost edge, DOE proposed using "the highest horizontal plane that a clothes load could occupy," which corresponded to Fill Level 3, the innermost diameter of the tub cover. App. 938 ¶ 166 (Pls.' Resp. to Defs.' Statement of Material Facts). Despite asserting that a comment period was unnecessary – on the theory that the guidance qualified as an interpretation of its existing regulations, *see* 5 U.S.C. § 553(b)(A) – DOE sought public comments on the proposed rule. *See* Dep't of Energy, *Guidance for Test Procedures for Clothes Washers* 1 (July 6, 2010). Whirlpool responded and advocated for a reading of the J1 Test Procedure that used Fill Level 4, which would produce a larger volume for the clothes container than Fill Level 3 and thus facilitate qualification for the Energy Star Program.

On July 6, 2010, DOE announced its final interpretation of the uppermost edge of the clothes container. It construed that term to describe Fill Level 3, or "the highest point of the inner-most diameter of the tub cover." *Id.* DOE did not specify a time for compliance with its interpretation of the J1 Test Procedure, but under the Energy Policy Act, DOE had to provide 270 days' lead time before a "significant revision to a product category, specification, or criterion" could take effect. 42 U.S.C. § 6294a(c)(7).

---

and the C6-1 as having a Modified Energy Factor of 1.848 and a Water Factor of 7.065.

17

In response to DOE's new interpretation, Whirlpool began retesting all of its then-existing top-loading clothes washers. That undertaking required over 2,000 hours of laboratory time.

A few months later, in September 2010, in administering its pilot program for independently verifying Energy Star compliance, DOE selected Whirlpool's Maytag Centennial C6-1 model for testing. That model was similar in energy- and water-efficiency to the C6-0 model according to Whirlpool's self-testing, and it had the same energy profile as the C7-0 model.

Because the pilot program commenced after the July 6 guidance, the independent laboratory tested the machine when operated below Fill Level 4. But, in self-testing the C6-1 model prior to the DOE's interpretation, Whirlpool had used Fill Level 4.

On September 20, 2010, DOE notified Whirlpool of the Stage I results. The independent laboratory determined that the C6-1 unit did not fall within five percent of the Energy Star Program's efficiency requirements. Accordingly, the C6-1 model failed Stage I testing for Energy Star compliance.

At Whirlpool's election, the testing proceeded to Stage II of the pilot program. The independent laboratory examined four additional C6-1 units and determined that none of them satisfied either criterion for Energy Star compliance. But in notifying Whirlpool of those results on January 19, 2011, DOE stated that the C6-1 model "will remain designated as ENERGY STAR qualified" until February 9, 2011. App. 956 ¶ 229 (Pls.' Resp. to Defs.' Statement of Material Facts). Even that date was less than 270 days from DOE's July 6 guidance.

Whirlpool did not object to having less than 270 days to comply with the DOE's new interpretation of the J1 Test Procedure. Rather, in December 2010, Whirlpool discontinued manufacturing its Maytag Centennial C6-0, C6-1, and C7-0

18

clothes washers. On May 7, 2012, the EPA disqualified those models from the Energy Star Program.

Altogether, Whirlpool had shipped nearly 175,000 units of the three models to retailers in seven states: California, Florida, Indiana, New Jersey, Ohio, Texas, and Virginia. Charlene Dzielak and other named plaintiffs, who resided in those states, each purchased one of the units between November 2009 and December 2010.

## II. PROCEDURAL HISTORY & GROUNDS FOR JURISDICTION

On January 5, 2012, Dzielak and one of the other named plaintiffs initiated this class action against Whirlpool and two of the retailers who had sold the company's Maytag Centennial clothes washers. Those retailers were Lowe's Companies, Inc. and Sears Holdings Corporation. As amended in July 2014, the complaint added named plaintiffs and sued three other retailers: Fry's Electronics, Inc., The Home Depot, Inc., and Appliance Recycling Centers of America, Inc.

All but one of the fourteen counts in the amended complaint asserted claims under state law. Three of the state-law counts were against all of the defendants for common-law causes of action: breach of express warranty, breach of the implied warranty of merchantability, and unjust enrichment. The other state-law counts were against Whirlpool and the in-state retailers for violations of the consumer-protection statutes of the states in which the named plaintiffs resided.

The District Court had original jurisdiction over those state-law claims under the Class Action Fairness Act. The class included at least 100 persons, *see* 28 U.S.C. § 1332(d)(5)(B), and it satisfied the minimal diversity requirement as the state citizenship of at least one member of the plaintiff class differed

19

from the state citizenship of at least one defendant.[16] *See id.* § 1332(d)(2)(A). Also, the class sought relief that was not to a legal certainty worth $5 million or less. *See id.* § 1332(d)(2); *Frederico v. Home Depot*, 507 F.3d 188, 193–99 (3d Cir. 2007).

Through a series of three motions to dismiss – in response to the original complaint and two amendments – Whirlpool and the retailer defendants challenged the plausibility of every count, including the lone claim under federal law pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)(1). *See* Fed. R. Civ. P. 12(b)(6). After the District Court's rulings on those motions, the Magnuson-Moss claims and some state-law claims were dismissed without prejudice, and the unjust enrichment claims against Whirlpool were dismissed with prejudice.[17] Several state-law claims remained, including those for breach of express warranty and those under the California, Florida, Indiana, New Jersey, Ohio, and Texas consumer-protection statutes.[18]

---

[16] The putative class members were citizens of California, Florida, Indiana, Michigan, New Jersey, Ohio, Texas, and Virginia, and the defendants were citizens of California, Delaware, Georgia, Illinois, Michigan, Minnesota, and North Carolina.

[17] One of the named plaintiffs, Jeffery McLenna, who sought to represent a subclass of Michigan purchasers, voluntarily dismissed all his claims under Federal Rule of Civil Procedure 41(a)(1)(A)(i).

[18] The other claims that survived the motion-to-dismiss stage were the claims for breach of the implied warranty of merchantability by the plaintiffs from Indiana, New Jersey, Texas, and Virginia and the unjust enrichment claims against the retailers on behalf of the plaintiffs from California, Indiana, New Jersey, Ohio, Texas, and Virginia.

The case proceeded to discovery on the surviving claims, and plaintiffs moved to certify a damages class. *See* Fed. R. Civ. P. 23(b)(3). After analyzing the requirements for such a class under Rule 23(a) and (b)(3), the District Court certified a class, which included subclasses by state, against only Whirlpool.[19] When combined with the District Court's prior rulings, each of the subclasses could pursue claims for breach of an express warranty against Whirlpool under a price-premium damages theory. And the subclasses in California, Florida, Indiana, New Jersey, Ohio, and Texas could seek similar damages under those states' consumer-protection statutes against Whirlpool.

Whirlpool and three of the five retailer defendants – Lowe's, Fry's Electronics, and Home Depot – moved for summary judgment on the remaining class and individual claims. Whirlpool also moved to decertify the class.

The District Court granted the summary-judgment motions and denied Whirlpool's decertification motion as moot. *See Dzielak v. Whirlpool Corp.*, 2019 WL 6607220, at *27 (D.N.J. Dec. 5, 2019). As a first step in evaluating the non-statutory claims, the District Court conducted a choice-of-law analysis and applied the substantive law of New Jersey, the forum state. *See id.* at *10–11. With respect to the claims for breach of an express warranty, the District Court explained that the Energy Star logo may have warranted that Whirlpool's clothes washers were "environmentally friendlier" than standard models and "met federal standards of efficiency," *id.* at *13, but it concluded that plaintiffs did not establish that the three models failed to conform to any such affirmation, promise, or description at the time they were sold, *see id.* at *14–15. In rejecting the claim for breach of the implied warranty of merchantability, the District Court held that plaintiffs did not

---

[19] Whirlpool sought immediate appellate review of the class-certification order under Rule 23(f). This Court denied that petition.

demonstrate that the models were unfit for their intended purpose. *See id.* at \*16–17. The District Court also concluded that a reasonable jury could not find that the retailer defendants were unjustly enriched from selling the washers. *See id.* at \*17. And without evidence of a false or misleading statement attributable to Whirlpool or the retailers, the District Court rejected plaintiffs' claims under the state consumer-protection statutes. *See id.* at \*18–27.

The District Court's order granting summary judgment further required plaintiffs to show cause why the ruling should not apply to one of the two defendants that did not move for summary judgment – Appliance Recycling Centers of America. Plaintiffs did not object, so the District Court entered an order extending its summary-judgment ruling to all defendants while recognizing that plaintiffs "preserv[ed] all substantive objections" thereto. D. Ct. Dkt., ECF No. 363, at 1 (Dec. 11, 2019). With that, the District Court made clear that "[j]udgment is final as to all parties and claims." *Id.* at 2. Plaintiffs then sought reconsideration of the ruling, and the District Court denied that motion.

After those rulings, plaintiffs timely appealed, and Whirlpool timely cross-appealed.

Whirlpool then moved to dismiss the appeals for lack of appellate jurisdiction. It argued that the only applicable basis for appellate jurisdiction was the final-order doctrine, *see* 28 U.S.C. § 1291, under which "an order which terminates fewer than all claims, or claims against fewer than all parties, does not constitute a 'final' order for purposes of appeal[.]" *Carter v. City of Philadelphia*, 181 F.3d 339, 343 (3d Cir. 1999). And despite a contrary statement in the District Court's opinion, Sears Holdings Corporation did not move for summary judgment because it had filed a voluntary petition for bankruptcy on October 15, 2018, and was therefore subject to the Bankruptcy Code's automatic stay. *See* 11 U.S.C. § 362(a)(1). Thus, the remaining claims against Sears – which

22

were claims by two named plaintiffs, Charles Beyer and Shelley Baker, for breaches of express and implied warranties, unjust enrichment, and violations of California and Indiana consumer-protection statutes – were left unresolved by the District Court.

Without more, that incompleteness due to the operation of the automatic stay would prevent the District Court's order from being final.[20] *See Mar. Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1206 (3d Cir. 1991) (explaining that absent relief from a bankruptcy stay, "judicial actions and proceedings against the debtor are void *ab initio*" regardless of "whether the court finds for or against the debtor" (emphasis removed)). Still, an order resolving fewer than all claims "may become final for the purposes of appeal where a plaintiff voluntarily and finally abandons the other claims in the litigation." *Bethel*

---

[20] The District Court's order was otherwise sufficient to establish the finality of the proceedings for purposes of 28 U.S.C. § 1291. Although its prior dismissal of plaintiffs' Magnuson-Moss claims invited plaintiffs to amend their complaint for a third time, plaintiffs did not avail themselves of that opportunity. Instead, plaintiffs elected to litigate their remaining state-law claims against the defendants to the end of the summary-judgment stage. So by finally resolving each of those claims (save for the ones against Sears) the District Court's order otherwise "accomplish[ed] all that the parties asked the court to accomplish[.]" *Aluminum Co. of Am. v. Beazer E., Inc.*, 124 F.3d 551, 560 (3d Cir. 1997). Similar reasoning applies to the named plaintiff from Michigan, McLenna, who removed himself as a party to the suit through a Rule 41 dismissal without prejudice of all of his claims against all defendants before the District Court's order disposing of all remaining claims against all remaining parties. The without-prejudice nature of that dismissal does not undermine the finality of the District Court's summary-judgment orders for purposes of this Court's appellate jurisdiction under 28 U.S.C. § 1291.

*v. McAllister Bros.*, 81 F.3d 376, 382 (3d Cir. 1996); *see also Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 246 (3d Cir. 2013). That rule applies even when a plaintiff abandons outstanding claims through representations made on appeal, such as through appellate briefing or statements made at oral argument, so long as the abandonment is final and unequivocal. *See Erie Cnty. Retirees Ass'n v. Cnty. of Erie*, 220 F.3d 193, 201–02 (3d Cir. 2000); *Bethel*, 81 F.3d at 382. And here, in response to Whirlpool's jurisdictional challenge, Beyer and Baker notified this Court that they "formally abandon their individual claims against Sears." Pls.' Resp. to Mot. to Dismiss at 12 (emphasis removed). That representation suffices to convert the District Court's ruling into a final decision appealable under § 1291. *See Tiernan v. Devoe*, 923 F.2d 1024, 1031 (3d Cir. 1991). Accordingly, Whirlpool's motion to dismiss for lack of appellate jurisdiction will be denied.

## III. DISCUSSION

In their opening brief, plaintiffs raise two challenges to the entry of summary judgment. First, they contend that as a matter of law the District Court erred in rejecting their breach-of-express-warranty claims against Whirlpool and the retailers. They argue that the Energy Star logo warranted that Whirlpool's clothes washers met the Energy Star Program's Modified Energy Factor and Water Factor standards when tested under the J1 Test Procedure using Fill Level 3. Second, plaintiffs assert that genuine disputes of material fact prevent summary judgment on their claims against Whirlpool and the retailers for breaches of express warranty and for violations of the state consumer-protection statutes.

As elaborated below, those arguments do not succeed. No material facts are genuinely disputed, and the District Court's entry of summary judgment on the breach-of-express-warranty and state consumer-protection claims was correct as a matter of law. *See* Fed. R. Civ. P. 56(a); *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203–04 (3d Cir. 2022) (explaining

that a factual dispute is 'material' when its resolution has "the potential to affect the outcome of the suit," and 'genuine' when the evidence presented could allow "a reasonable jury [to] return a verdict for the nonmoving party" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))).[21]

## A. The Claims for Breach of Express Warranty

No party disputes the District Court's application of New Jersey law to the claims for breach of express warranty. In New Jersey, a claim for breach of express warranty consists of four elements. The first three relate to the creation of the warranty, and the last one defines breach:

> 1. A seller must make an affirmation of fact, promise, or description related to goods or

---

[21] The parties present two additional arguments, but neither needs to be addressed on the merits. First, in its opening brief as cross-appellant, Whirlpool argues that the class should not have been certified because it does not satisfy the predominance requirement for a damages class, *see* Fed. R. Civ. P. 23(b)(3), and separately because plaintiffs' damages model does not fit with their theory of liability, *see Comcast Corp. v. Behrend*, 569 U.S. 27, 34–38 (2013). But Whirlpool conditions its challenge to class certification on plaintiffs prevailing in their own appeal, and with the affirmation of the District Court's summary-judgment order, the condition for Whirlpool's cross-appeal is not satisfied. Second, plaintiffs, in their reply brief, attempt to extend the arguments in their opening brief to resurrect their claims for unjust enrichment and breach of the implied warranty of merchantability. But by not raising those challenges until their reply brief, plaintiffs forfeited them. *See In re Asbestos Prods. Liab. Litig. (No. VI)*, 873 F.3d 232, 237 (3d Cir. 2017). Regardless, those claims could not succeed because they rely on the same unsuccessful rationales presented in plaintiffs' opening brief.

the seller must provide a sample or model of goods;

2. The affirmation, promise, description, sample, or model must serve as a basis of the bargain between the seller and the buyer;

3. The buyer must accept the goods; and

4. The goods must not conform to the affirmation, promise, description, sample, or model.

*See* N.J. Stat. Ann. §§ 12A:2-313(1), 12A:2-714(2); *Furst v. Einstein Moomjy, Inc.*, 860 A.2d 435, 441 (N.J. 2004) (explaining that damages for breach of an express warranty is "the remedy for a buyer who has *accepted* defective goods" (emphasis added)).

The parties dispute the first and fourth elements. Plaintiffs argue that the Energy Star logo constitutes an affirmation, promise, or description that a clothes washer satisfies Energy Star standards when measured using Fill Level 3 and that Whirlpool's three models of Maytag clothes washers did not do so. Whirlpool and the retailers respond that the logo is not sufficiently concrete to make any affirmation, promise, or description. And even if it did, they assert that the most the Energy Star logo promised was generally better performance relative to non-Energy Star washers.

New Jersey uses an objective test to determine whether a statement by a seller constitutes an affirmation, promise, or description that could form the basis of an express warranty. As articulated by the New Jersey Supreme Court, a seller's statement does so "if it could fairly be understood, regardless of [the seller's] intent, to constitute an affirmation or representation that the [goods] possessed a certain quality and capacity relating to future performance." *Gladden v. Cadillac*

26

*Motor Car Div., Gen. Motors Corp.*, 416 A.2d 394, 397 (N.J. 1980); N.J. Stat. Ann. § 12A:2-313(2) ("It is not necessary to the creation of an express warranty that the seller . . . have a specific intention to make a warranty . . . ."); *cf. Nester v. O'Donnell*, 693 A.2d 1214, 1220 (N.J. App. Div. 1997) (looking to the "objective manifestations of the parties' intent" to determine the meaning of a contractual agreement). Thus, under New Jersey law, for a statement to constitute an affirmation, promise, or description that could form the basis of an express warranty, that statement must be reasonably understood as communicating that "the good sold will conform to some standard which may be established by a model, a level of quality, an assurance, a description[,] or a list of specifications." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 824 (3d Cir. 1999).

Even with that guidance, the questions of whether and to what extent the Energy Star logo, as a certification mark, creates an express warranty remain novel. But from the parties' briefing and the District Court proceedings, three theories emerge. Those are described and analyzed below.

### 1. The Authorized-Use Theory: The Energy Star Logo as Warranting the Department of Energy's Authorization.

The first, and narrowest, view is an authorized-use theory, which the District Court described as a "branding" theory of liability. *Dzielak*, 2019 WL 6607220, at \*15. Under that theory, the use of a certification mark indicates only that the mark's owner authorized the use of the mark in connection with the user's goods. Applied here, this theory would mean that Whirlpool's use of the Energy Star logo affirmed, promised, or described nothing more than the EPA's and DOE's authorization to use the logo in marketing and labeling the three models of Maytag Centennial clothes washers.

But that warranty was not breached. At a minimum, the display of a certification mark affirms, promises, or describes

27

that the owner of the mark has authorized the mark's use in connection with the labeled or marketed product. And here, the clothes washers conformed to that affirmation, promise, or description. DOE informed Whirlpool that the tested model, the C6-1, would "remain designated as ENERGY STAR qualified" until February 2011, App. 956 ¶ 229 (Pls.' Resp. to Defs.' Statement of Material Facts), which was months after any named plaintiff purchased any of the models. Because the other two models had similar or identical energy profiles to the C6-1, no reasonable jury could find that DOE did not permit the use of the Energy Star logo on those three models at all relevant times. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 525 (1992) ("A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty.").

> 2. *The Certification-Statement Theory: The Energy Star Logo as Warranting Greater Efficiency Than Standard Models.*

The second approach, a certification-statement theory, which in this context, the District Court termed the "energy efficiency" theory, is more expansive. *Dzielak*, 2019 WL 6607220, at *15. It is grounded in the certification-statement requirement for registration applications for certification marks with the Patent and Trademark Office. By regulation, an applicant must include a certification statement that specifies "the conditions under which the certification mark is used." 37 C.F.R. § 2.45(a) (2007). And in its 2008 application to register the Energy Star logo, the EPA's certification statement specified that the display of the logo indicates its authorized use and that the corresponding product is "more energy efficient than most items sold in the same category." 2008 Energy Star Application at 1. Similarly, in depositions, most of the named plaintiffs professed to understand the

Energy Star logo along these lines.[22]  Thus, under this theory, the Energy Star logo warrants not only authorized use but also greater energy efficiency than a standard model.  *See Dzielak*, 2019 WL 6607220, at *15.

Such a conclusion, however, is an uneasy fit with the structure of federal law on certification marks.  Construing a certification mark as warranting something more than authorized use imposes joint responsibility for the accuracy of the mark's use on the mark's owner and on its authorized users.  Yet the Lanham Act places that responsibility on only the mark's registered owner.  *See* 15 U.S.C. § 1064(5)(A) (subjecting a certification mark to cancellation if the registrant "does not control, or is not able legitimately to exercise control over, the use of such mark"); *see also Midwest Plastic*, 906 F.2d at 1572; 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 19:94 (5th ed. 2023) ("[T]he certification mark *owner* should, through advertising, convince buyers that the certification mark provides useful and reliable information as to quality." (emphasis added)).  Thus, it might not be reasonable to interpret a certification mark as a warranty by the seller that its goods in fact conform to the mark's standards.  Such a mark may, instead, communicate nothing more than "that the goods have been *certified* as meeting the standards set forth by the certifier."

---

[22] *See, e.g.*, App. 982 ¶ 19 (Pls.' Resp. to Defs.' Statement of Material Facts) (Kari Parsons testifying that "I knew that if I saw the Energy Star label, that the machine, the washing machine, was going to be efficient, was going to save money and utilities, water and electricity"); *id.* at 983 ¶ 20 (Shelley Baker testifying that the Energy Star logo meant that "if you pay more for this machine, it will run at a more efficient rate than one that is not Energy Star"); *id.* at 986 ¶ 26 (Jonathan Cohen testifying that he thought his Energy Star-labeled washing machine "was regulated or tested by what I assume to be a government agency, and it was approved for energy savings and water savings").

*Interprofession du Gruyere v. U.S. Dairy Exp. Council*, 61 F.4th 407, 415–16 (4th Cir. 2023) (internal quotation marks omitted) (emphasis added) (describing certification marks at a general level but not opining on any theory of express-warranty liability associated with the use of a certification mark); *see also Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 190 n.3 (3d Cir. 1990) (explaining that certification marks can be used to certify that "products meet the mark registrant's standards"). To hold otherwise, at least in the absence of fraud, would expose authorized users of a certification mark to liability for the lax oversight or wrongful approval of their products by the mark's owner.[23] That could discourage use of the mark and pose an obstacle to the "accomplishment and execution of the full purposes and objectives" of the Lanham Act's certification-mark provisions. *Wyeth v. Levine*, 555 U.S. 555, 563–64 (2009) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see generally* 15 U.S.C. §§ 1054, 1127. Instead, although this Circuit has not had occasion to consider the issue, it may be that a party aggrieved by an improper certification of a product could seek redress from the mark's owner – as opposed to the user of the mark. *See, e.g.*, *U.S. Structural Plywood Integrity Coal. v. PFS Corp.*, 2022 WL 953150, at *1, 40 (S.D. Fla. Mar. 30, 2022) (allowing claims for false advertising under the Lanham Act and for state-law negligence against the owner of a certification mark for improper certification to proceed to trial).

---

[23] If a user of the mark deceived the mark's owner as to the qualities of a product, imposing liability on the user may be justified. *Cf.* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 19:90 (5th ed. 2023) (explaining that the unauthorized use of a certification mark may amount to counterfeiting). When an owner of a certification mark relies on the user for information about a product, such as through self-testing, the user's liability for the erroneous use of the mark becomes a more difficult question.

It is unnecessary here to determine the legal viability of the certification-statement theory. Even assuming for the sake of argument that the display of the Energy Star logo on a clothes washer did warrant that the machine was "more energy efficient than most items sold in the same [category]," 2008 Energy Star Application at 1, the three models conformed to that affirmation, promise, or description. Congress and DOE developed baseline efficiency standards that all residential clothes washers on the market were required to satisfy. *See* 42 U.S.C. § 6295(g)(9)(A) (2007); 10 C.F.R. § 430.32(g)(3) (2007). And compared to those minimum standards, the three Maytag Centennial models, even when tested at Fill Level 3, consumed 46.1% less water and 34.3% less energy. That corresponds to between 92% and 93% of the water and energy savings of machines qualifying for the Energy Star Program at Fill Level 3. Thus, even if the Energy Star logo did warrant comparative energy efficiency, a reasonable jury could not conclude that the three models failed to conform to that warranty.

> 3. *The Absolute-Compliance Theory: The Energy Star Logo as Warranting Satisfaction of the Program's Modified Energy Factor and Water Factor Standards When Measured at Fill Level 3.*

The third theory of express warranty, which the District Court rejected on plaintiffs' motion for reconsideration, takes the broadest view. This approach posits that the display of the Energy Star logo on a clothes washer affirms, promises, or describes that machine as meeting the Program's Modified Energy Factor and Water Factor requirements using the J1 Test Procedure administered at Fill Level 3 per the DOE guidance on July 6, 2010. Although the record lacks direct evidence that consumers understood the logo in those precise terms, the EPA's registration application for the Energy Star logo included, as required by regulation, "a copy of the standards that determine whether others may use the certification mark

31

on their goods." 37 C.F.R. § 2.45(a) (2007). So, like the certification-statement theory, this approach rests on the open legal question of the liability of a certification mark's user for the erroneous certification of a product by the mark's owner. But even if that issue is resolved in favor of imposing liability on the mark's user, plaintiffs could not prevail under the absolute-compliance theory. Neither the Energy Star logo's ordinary meaning nor its established industry or regulatory meaning allows a fair understanding that the logo affirmed, promised, or described clothes washers as Energy Star compliant when tested at Fill Level 3 rather than Fill Level 4.

*Ordinary Meaning*

The ordinary meaning of the Energy Star logo, which applies to numerous categories of products, does not indicate that clothes washers qualified for the Program when tested at Fill Level 3. The information needed to read the logo as warranting Program compliance at Fill Level 3 – the Energy Star Program's efficiency standards, the J1 Test Procedure, the July 6 guidance, and appliance manufacturers' pre-2010 testing practices – is well beyond the ken of an ordinary purchaser. As a reference point, the named plaintiff with the most detailed pre-litigation understanding of the Energy Star Program did not possess that degree of technical understanding.[24] Similarly, one of plaintiffs' own expert witnesses opined that "[c]onsumers don't understand the exact technical details of the amount of energy efficiency." Supp. App. 368 (Dep. of Dr. Ramamirtham Sukumar).

---

[24] App. 946 ¶¶ 196–97 (Pls.' Resp. to Defs.' Statement of Material Facts) (summarizing deposition testimony from Aspasia Christy that she understood the Energy Star logo to warrant "about 50 percent savings in water and 37 percent savings in electricity" but that she did not know of the J1 Test Procedure or testing using the different possible fill levels).

*Specialized Meaning*

In Whirlpool's view, the lack of evidence that ordinary consumers understood the specific requirements of the Energy Star Program clinches the case. But under New Jersey's adoption of the Uniform Commercial Code, "all descriptions by merchants must be read against the applicable trade usages" in assessing the scope of an express warranty. N.J. Stat. Ann. § 12A:2-313 cmt. 5. Accordingly, the use of a specialized term or symbol can create an express warranty by incorporating an established industry or regulatory meaning. *See, e.g.*, *Simpson v. Widger*, 709 A.2d 1366, 1371–72 (N.J. App. Div. 1998) (examining the specialized or technical meaning of the term "sound" when used to warrant the condition of a horse); 3 David Frisch, *Anderson on the Uniform Commercial Code* § 2-313:84 (3d. ed. 2022) ("A statement by the seller that the product, a swimming pool, could be used commercially constituted an express warranty that the product complied with local regulations applicable to commercial use."). And certification marks, too, can be used to signal compliance with industry or regulatory standards. *See* 15 U.S.C. § 1127; *Opticians Ass'n of Am.*, 920 F.2d at 190 n.3. Indeed, certain of Whirlpool's promotional materials characterized its display of the Energy Star logo as representing its clothes washers' compliance with federal standards of energy efficiency.

Nonetheless, for the relevant time period, the record is barren of evidence that even under its industry meaning, the Energy Star logo warranted that the clothes washers qualified for the Program when tested at Fill Level 3. Ambiguities in the testing parameters before the July 6 guidance and uncertainties associated with its effective date prevented the guidance from being fairly understood as changing the meaning of an Energy Star logo displayed on clothes washers such that the logo warranted successful testing at Fill Level 3.

Before the DOE guidance on July 6, 2010, the J1 Test Procedure was ambiguous. DOE recognized that, without additional clarification, the term 'uppermost edge' could be

fairly understood to refer to multiple different fill levels, including Fill Level 3 and Fill Level 4. *See* Energy Conservation Program for Consumer Products: Test Procedure for Residential Clothes Washers, 75 Fed. Reg. 57,556, 57,559 (Sept. 21, 2010) (stating that the J1 Test Procedure permitted "[d]ifferent allowable interpretations of the maximum water fill level"); *id.* at 57,574 (observing that the J1 Test Procedure's "general specification of the water fill level could lead to multiple capacity measurements"). Confirming, at a minimum, the lack of an accepted industry or regulatory meaning of 'uppermost edge,' DOE in 2007, through the Berringer email, had permitted Whirlpool to qualify its clothes washers for the Energy Star Program based on testing at Fill Level 4. In light of that uncertainty, especially during Energy Star's era of manufacturer self-testing, Whirlpool's use of the Energy Star logo before July 2010, without more, could not be fairly construed as incorporating an established industry or regulatory meaning that its Maytag Centennial clothes washers had been tested at Fill Level 3 instead of Fill Level 4. *See* N.J. Stat. Ann. § 12A:1-303(c) (requiring a trade usage to have "such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question").

Contrary to plaintiffs' assertions, the July 6 guidance did not definitively resolve that ambiguity for clothes washers that displayed the logo and were sold beforehand. There is a general presumption against retroactive regulation, *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), and nothing about the July 6 guidance overcomes that presumption. As a work-around, plaintiffs characterize that guidance as an interpretive rule that merely clarified the meaning of an existing regulation, the J1 Test Procedure. *See Levy v. Sterling Holding Co.*, 544 F.3d 493, 506 (3d Cir. 2008) (explaining that "where a new rule constitutes a clarification – rather than a substantive change – of the law as it existed beforehand, the application of that new rule to pre-promulgation conduct necessarily does *not* have an impermissible retroactive

34

effect"). Yet even if the July 6 guidance were a valid interpretive rule – a debatable proposition[25] – it would not transform the meaning of the Energy Star logo on clothes washers for express-warranty purposes. Under New Jersey's Uniform Commercial Code, to constitute a warranty, that change would had to have been "fairly . . . regarded as part of the contract." N.J. Stat. Ann. § 12A:2-313 cmt. 7; *see also Liberty Lincoln-Mercury*, 171 F.3d at 825; N.J. Stat. Ann. § 12A:2-313(1) (requiring the affirmation, promise, or description to form "part of the basis of the bargain"). And the July 6 guidance could not be fairly regarded as part of the contracts for clothes washers previously sold and accepted.

After its issuance, the July 6 guidance did not immediately transform the meaning of the Energy Star logo on clothes washers. The guidance affected which clothes washers could

---

[25] To qualify as an interpretive rule, an agency rule must do more than resolve an ambiguity; it must do so through an interpretative method as opposed to policy considerations. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (describing interpretive rules as "issued by an agency to advise the public of the agency's *construction* of the statutes and rules which it administers" (emphasis added) (quoting Attorney General's Manual on the Administrative Procedure Act (1947))); *see also Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 170 (7th Cir. 1996) (limiting interpretive rules to those that "can be derived from the regulation by a process reasonably described as interpretation"). Yet DOE's guidance does not invoke any of the traditional tools of construction. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (defining the standard "interpretive tools" to include the "text, structure, history, and purpose" of a regulation or statute). And even if the July 6 guidance were an interpretive rule, it would "not have the force and effect of law" nor would it be "accorded that weight in the adjudicatory process." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)).

35

qualify for the Energy Star Program, and it ultimately resulted in the disqualification of the three Maytag Centennial models.[26] But by statute, "a new or a significant revision" to any Energy Star "product category, specification, or criterion" cannot take effect for 270 days unless DOE or the EPA specifies otherwise. 42 U.S.C. § 6294a(c)(7). It may be that modifications to test procedures do not qualify as revisions to "product category, specification, or criterion," such that the 270-day lead time does not apply to revisions to procedures for testing products. *Id.* But that is not clear, and without a specified earlier effective date for the July 6 guidance, the uncertainty associated with the logo's meaning when displayed on a clothes washer prevented it from being fairly regarded as certifying compliance at Fill Level 3 for 270 days, until at least March 2011 – after any plaintiff purchased one of the models.

Assuming, for the sake of argument, that the July 6 guidance could have taken immediate effect, that would not simultaneously transform the Energy Star logo into an express warranty of compliance with the new guidance. A reasonable purchaser would still have had doubts that after July 6, 2010, the display of the Energy Star logo on machines certified something different than the logo did for the same models that were sold and accepted before the guidance. Indeed, the July 6 guidance prompted a lengthy and complex recertification process. For Whirlpool, that change to the testing protocols required "an all hands-on-deck, multi-month effort," consuming "more than 2,000 hours of lab time." App. 944 ¶ 183 (Pls.' Resp. to Defs.' Statement of Material Facts). The independent testing under DOE's pilot program was not much faster. It took months to confirm that the selected Maytag model did not meet Energy Star standards at Fill Level 3. And even after that determination, DOE still allowed the model to bear the Energy Star label for twenty days, until

---

[26] Three of the named plaintiffs purchased their units after the July 6 guidance but before February 9, 2001, the date to which DOE permitted the models to bear the Energy Star logo.

February 9, 2011 – which was after any plaintiff purchased one of the machines. Thus, in the context of the regulated industry, it is not reasonable to understand the Energy Star logo on the same model clothes washer to convey a different affirmation, promise, or description until at least the expiration of DOE's permission for the logo's use (if not the full 270 days specified in statute).

In sum, at least between November 2009 and December 2010 – the time period during which the named plaintiffs purchased their washers – the July 6 guidance did not transform the prior ambiguities in the J1 Test Procedure, much less those in the Energy Star logo itself, into a "specific" affirmation, promise, or description that a clothes washer complied with Energy Star standards when tested at Fill Level 3. *Herbstman v. Eastman Kodak Co.*, 342 A.2d 181, 187 (N.J. 1975). Thus, the District Court did not err in rejecting plaintiffs' absolute-compliance theory.

## B. The State Consumer-Protection Claims

Plaintiffs also challenge the District Court's entry of summary judgment against their statutory causes of action. Those claims were grouped by subclasses based on the applicable state's consumer-protection statutes, which allow civil redress for unfair methods of competition, abusive sales practices, false advertising, fraud, and similar wrongs. *See Dzielak*, 2019 WL 6607220, at *18–27.[27] The parties agree

[27] Plaintiffs' consumer-protection claims sought redress under three California statutes (the Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a), False Advertising Law, Cal. Bus. & Prof. Code § 17500, and Unfair Competition Law, *id.* § 17200), Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201–.213, Indiana's Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-4, two New Jersey Statutes (the Consumer Fraud Act, N.J. Stat. Ann. § 56:8-19, and Truth-in-Consumer Contract, Warranty, and Notice Act, *id.* § 56:12-17), Ohio's Consumer Sales Practices Act, Ohio Rev. Code

37

that each of those statutory causes of action requires a false or misleading statement, the spread of deceptive advertisements, or conduct by the defendant that is otherwise unfair, deceptive, or unconscionable. *See id.* But, as explained above, the Energy Star logo cannot be reasonably construed to affirm, promise, or describe clothes washers as satisfying Energy Star standards at Fill Level 3 during the class period. And without any deception associated with the logo's use on the three Maytag model clothes washers, the District Court did not err in granting summary judgment on those claims.

## IV.  CONCLUSION

For these reasons, we will affirm the District Court's summary judgment and dismiss Whirlpool's cross-appeal.

---

Ann. § 1345.02, and Texas's Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41–.63.